## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

**FREEDOM FROM RELIGION**
**FOUNDATION, INC.,**

                         Plaintiff,

v.

                         Case No. 12 CV 0818

**DOUGLAS SHULMAN, Commissioner of the**
**Internal Revenue Service, in his official**
**capacity**,

                         Defendant.

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## GOVERNMENT'S MOTION TO DISMISS

---

I.       **INTRODUCTION**.

       The Government grants organizations tax-exempt status under § 501(c)(3) of the

Internal Revenue Code.   This beneficial status, however, requires that tax-exempt

organizations not intervene in political campaigns, but the Government does not enforce

this restriction against churches and religious organizations.   The Government,

nonetheless, maintains that other tax-exempt organizations should not object to church

preferences and should mind their own business.   According to the Government,

preferential treatment of religious organizations is strictly a matter of Internal Revenue

Service discretion that is not subject to Constitutional accountability.   The Government,

therefore, moves the court to dismiss this action without considering the merits.

The Plaintiff, Freedom From Religion Foundation, Inc. ("FFRF"), opposes the Government's Motion to Dismiss.  The Plaintiff has standing to seek nullification of the Government's policy of preferential treatment of churches and other religious organizations, including non-enforcement of restrictions that are applied to other tax-exempt organizations like the Plaintiff.

The Government's claim that the Plaintiff should either mind its own business or subject itself to the risk of losing its tax-exempt status ignores the fact that discrimination among similarly situated taxpayers is itself a redressable harm.  Underinclusive policies and practices otherwise would be essentially unchallengable -- a point that the Government implicitly makes clear by arguing that only churches and religious organizations are within the zone of interest of the preference that they alone receive.

The Government seems tone deaf to the irony of its argument that non-preferred organizations lack standing because they are not beneficiaries of the Government's discriminatory policy.  In fact, in the case of underinclusive policies, the law clearly recognizes that disadvantaged parties do have standing to seek nullification of the preference, or else the discriminatory preference would become self-perpetuating.  The recipient of a preference, after all, is unlikely to challenge it.

The Plaintiff, for its part, does not allege a generalized grievance common to all citizens.  The Plaintiff is similarly situated to churches and other religious organizations which otherwise qualify for tax-exempt status under § 501(c)(3) of the Internal Revenue Code.  Churches and other religious organizations, however, are not required by the

Government to comply with restrictions on political activity, based solely on their religious status.

The violation of the Establishment Clause, and the denial of Equal Protection, occur in this case because the Government treats churches and religious organizations more favorably than the similarly situated Plaintiff. Such discriminatory treatment provides a basis for standing that the Supreme Court has specifically recognized in order to redress disparate treatment under the Establishment Clause.

The United State Supreme Court recently recognized in *Arizona Christian School Tuition Organization v. Wynn*, 131 S. Ct. 1436, 1440 (2011), that plaintiffs have standing when they incur a burden or are not eligible for a benefit on account of religious criteria. The Supreme Court pointedly stated: "Those costs and benefits can result from alleged discrimination in the Tax Code, such as when the availability of a tax exemption is conditioned on religious affiliation." *Id*.

The present case involves a type of discrimination similar to that which the Supreme Court deemed to confer standing in *Wynn*. On its facts, the present case is distinct from *Wynn*, which did not involve discriminatory preferences that were provided only to religious organizations. The present case, by contrast, presents systemic preferential treatment under the Internal Revenue Code that is only available to churches and religious organizations. In this situation, the Plaintiff does have standing to challenge favorable treatment that is not provided to similarly situated organizations under the Tax Code.

Finally, the Plaintiff's action is not barred by the sovereign immunity of the United States.  Section 702 of the Administrative Procedure Act provides a complete and sufficient waiver of the Government's immunity.  The waiver in § 702 is not limited to administrative appeals of conduct falling within the narrow definition of "final agency action," contrary to the Government's argument.  *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).  The waiver includes causes of action against the Government that are not created by the APA, including claims of unconstitutional conduct, as in the present case.

## II.  STATEMENT OF ALLEGED FACTS AND CLAIMS.

The Plaintiff seeks a Declaration under 28 U.S.C. § 2201 that the Government has violated, continues to violate, and will continue to violate in the future, the Establishment Clause of the First Amendment to the Constitution of the United States by systematically failing to enforce the electioneering restrictions of § 501(c)(3) of the Tax Code against churches and religious organizations.   The Government's actions also violate the Plaintiff's Equal Protection rights.  (Compl., ¶ 1.)

Plaintiff requests the Court to enjoin the Government from continuing a policy of non-enforcement of the electioneering restrictions against churches and religious organizations.  The Plaintiff also requests the Court to order the Government to authorize a high ranking official within the IRS to approve and initiate enforcement of the restrictions of § 501(c)(3) against churches and religious organizations, including the electioneering restrictions, as required by law.  (Compl., ¶ 2.)

The Plaintiff is a tax-exempt non-profit organization under § 501(c)(3) of the Tax Code, and as such, FFRF must and does abide by the electioneering restrictions of § 501(c)(3).  (Compl., ¶ 6.)

The Plaintiff is a non-profit membership organization that advocates for the separation of Church and State and educates on matters of non-theism.  The Plaintiff has more than 19,000 members, residing in every state of the United States, as well as the District of Columbia.  (Compl., ¶ 7.)

Section 501(c)(3) of the Tax Code prohibits all non-profit organizations, including churches and other religious organizations, from intervening in political campaigns as a condition of their tax-exempt status.  (Compl., ¶ 12.)

All organizations that are recognized as exempt from federal income tax under § 501(c)(3) of the Tax Code are subject to the prohibition against political campaign intervention.  (Compl., ¶ 13.)

All organizations, including churches and religious organizations, that are exempt from federal income tax under § 501(c)(3) of the Tax Code are supposed to be prohibited from participating or intervening, directly or indirectly, in political campaigns on behalf of or in opposition to any candidate for elective public office.  (Compl., ¶ 14.)

The restrictions of § 501(c)(3) on electioneering activities do not preclude discussion of issues that are not linked to support for or opposition to candidates; the fact that candidates may align themselves on one side or another of an issue does not restrict the ability of religious organizations to engage in discussions of that issue.  (Compl., ¶ 15.)

A discussion of issues violates the electioneering restrictions of § 501(c)(3) of the Tax Code if the discussion contains overt support for or opposition to a particular candidate. (Compl., ¶ 16.)

Factors relevant to determining whether an advocacy communication constitutes impermissible campaign intervention include: (a) whether the communication identifies one or more candidates for a public office; (b) whether the communication expresses approval or disapproval of one or more candidates' positions and/or actions; (c) whether the communication is delivered close in time to an election; (d) whether the statement makes reference to voting or an election; and (e) whether the issue addressed in the communication has been raised as an issue distinguishing candidates for a given office. (Compl., ¶ 17.)

The electioneering prohibition of § 501(c)(3) applies to tax-exempt organizations, including churches and religious organizations, and to the actions of individuals, including clergy or other religious leaders, acting as representatives of tax-exempt organizations. (Compl., ¶ 18.)

In fact, however, the Internal Revenue Service has followed and continues to follow a policy of non-enforcement of the electioneering restrictions of § 501(c)(3) against churches and other religious organizations. (Compl., ¶ 21.)

As a result, in recent years, churches and religious organizations have been blatantly and deliberately flaunting the electioneering restrictions of § 501(c)(3), including during the presidential election year of 2012. Illinois Bishop Daniel Jenky, for

example, required that a partisan letter be read by every celebrating priest in the diocese to congregants the weekend before the recent Presidential election.  (Compl., ¶ 22.)

More than 1,500 clergy reportedly also violated § 501(c)(3) on October 7, 2012, in a deliberate and coordinated display of noncompliance with the electioneering restrictions of § 501(c)(3), including prominent megachurches.  (Compl., ¶ 23.)

The Billy Graham Evangelistic Association ran blatantly partisan full-page ads in October of 2012 in the Wisconsin State Journal; the Ministry also ran ads in the New York Times, USA Today, the Wall Street Journal, and more than a dozen national and battle ground state newspapers before November 6, 2012.   The Association also published expressly partisanship matter on its website at www.billygraham.org.  (Compl., ¶ 24.)

Open and notorious violations of the electioneering restrictions of § 501(c)(3) by churches and other religious organizations have been occurring since at least 2008, with churches recording their partisan activities and sending the evidence to the IRS.  (Compl., ¶ 25.)

The Internal Revenue Service, however, is following a policy and practice of non-enforcement of § 501(c)(3) against churches and religious organizations.  (Compl., ¶ 26.)

The IRS, on information and belief, has failed even to designate an official with authority to initiate enforcement of § 501(c)(3) against churches and other religious organizations.  (Compl., ¶ 27.)

The non-enforcement of the electioneering restrictions of § 501(c)(3) against churches and other religious organizations constitutes preferential treatment of churches

and religious organizations that is not provided to other tax-exempt organizations, including FFRF, which are required to comply with the electioneering restrictions of § 501(c)(3).  (Compl., ¶ 28.)

The Government's non-enforcement of § 501(c)(3) against churches and religious organizations provides preferential treatment that is not neutrally available to other tax-exempt organizations, including the plaintiff FFRF.  (Compl., ¶ 29.)

The non-enforcement of § 501(c)(3) as to churches and other religious organizations by the IRS directly benefits churches and religious organizations, while discriminating against other non-profit organizations, including the plaintiff FFRF, solely on the basis of religious criteria.  (Compl., ¶ 30.)

Churches and religious organizations obtain a significant benefit as a result of being exempt from income taxation, while also being able to preferentially engage in electioneering, which is something secular tax-exempt organizations cannot do.  (Compl., ¶ 31.)

## III.   DISCRIMINATORY TREATMENT OF SIMILARLY SITUATED TAXPAYERS UNDER SECTION 501(c)(3) OF THE TAX CODE CONSTITUTES INJURY SUFFICIENT FOR STANDING UNDER THE ESTABLISHMENT CLAUSE.

Preferential tax treatment provided only to religious organizations violates the Establishment Clause.  Neutrality is a basic requirement of the Establishment Clause: Benefits under the Code cannot be preferentially provided just to churches.  The Supreme Court has consistently refused to allow the Government to preferentially favor religion

with advantages that are not generally available to similarly situated taxpayers. *Texas Monthly v. Bullock*, 489 U.S. 1 (1989).

In the present case, the Plaintiff is a tax-exempt organization under § 501(c)(3) that is required to comply with electioneering restrictions to maintain its status -- but religious organizations are not required to do so. Neutrality is missing.

Government policies that allocate benefits based on distinctions among religious, and non-religious or non-believer status, are doomed from the start. The Sixth Circuit Court of Appeals explained this constitutional reality in *American Atheists, Inc., et al. v. City of Detroit Downtown Development Authority*, 567 F.3d 278, 289 (6th Cir. 2009):

> The most essential hurdle that a government-aid program must clear is neutrality -- that the program allocates benefits in an evenhanded manner to a broad and diverse spectrum of beneficiaries. *See Good News Club v. Milford Central School*, 533 U.S. 98, 114, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001); *Mitchell*, 530 U.S. at 809-13 (Plurality Opinion; *Id*. at 838. (O'Connor, J., concurring in the judgment). Phrased as an interrogatory: Does the program determine a recipient's eligibility for benefits in spite of, rather than because of, its religious character? *See Mitchell*, 530 U.S. at 809-10 Plurality Opinion); *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 839-40, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995).
>
> Since its earliest explorations of the Establishment Clause, the [Supreme] Court has underscored neutrality as a central, though not dispositive, consideration in sizing up state-aid programs. *See Mitchell*, 530 U.S. at 809-10 (Plurality Opinion) *Rosenberger*, 515 U.S. at 839; *Id*. at 846 (O'Connor, J., concurring); *Everson*, 330 U.S. at 17-18. What the Court has said matches what it has done. Programs that allocate benefits based on distinctions among religious, non-religious and religious recipients are generally doomed from the start. *See, e.g., Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 14-15, 109 S. Ct. 890, 103 L. Ed. 2d 1 (1989) (Plurality Opinion) (Invalidating state sales-tax exemption "for periodicals published or distributed by a religious faith and consisting wholly of writings promulgating the teaching of the faith"); *Larson v. Valente*, 456 U.S. 228, 246-47, and n.23, 255, 102 S. Ct. 1673, 72 L. Ed. 33 (1982) (Striking down

9

state law exempting only certain "well-established churches" from various registration and recording requirements), *School District of Abington Township v. Schempp*, 374 U.S. 203, 205, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963) (Invalidating programs mandating daily Bible reading in public school). Programs that evenhandedly allocate benefits to a broad class of groups, without regard to their religious beliefs, generally will withstand scrutiny.

In the present case, the Government's policy and practice of exempting churches from the electioneering restrictions of § 501(c)(3) fails the neutrality test required by the Establishment Clause. The preferential treatment of churches is not provided to the Plaintiff or other non-religious tax-exempt organizations, a fact which the Plaintiff will prove when given the chance.

The Government, however, suggests that the court assume that the allegations of the Complaint are not true, including the allegation that the IRS has a practice and policy of not enforcing the electioneering restrictions of § 501(c)(3) against churches and religious organizations. At the pleading stage, of course, general factual allegations of injury resulting from a defendant's conduct suffice because the court presumes that the allegations embrace those specific facts that are necessary to support the claim. *Lac Du Flambeau v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005), quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990).

In the event, however, the Plaintiff will prove without question that the Government does have a practice and policy of not enforcing the restrictions on partisan politicking against churches and religious organizations. This is no secret any longer. For example, in late October of 2012, Russell Renwick of the IRS's Tax-Exempt and Government Entities Division reportedly admitted that the IRS has officially halted tax

audits of churches, even in egregious cases of violations of § 501(c)(3).  (Bolton Decl., ¶ 3).  Other public statements indicate that the IRS has not been auditing churches since at least 2009.  (Bolton Decl., ¶¶ 4-5).  As a result, churches and religious organizations have been blatantly engaging in political activity in violation of the restrictions of § 501(c)(3), with perhaps hundreds of videotapes of such violations being sent by churches to the IRS.  (Bolton Decl. ¶ 5).  The Plaintiff also has notified the IRS of numerous such violations by churches and religious organizations.  (Bolton Decl. ¶ 5).  The Government, however, ignores the reported violations, which now occur with impunity.

Such preferential treatment under the Tax Code, which is not neutrally available to a broad range of groups or persons without regard to religion, violates the Establishment Clause.  The Supreme Court recognized this principle in *Texas Monthly*, and the Court has never waivered since in its holdings that neutrality is a necessary requirement of such government programs.

The core principle animating the Establishment Clause is that government may not favor religion over non-religion.   *Texas Monthly*, 489 U.S. at 9-10.   "When the government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion ... it provides unjustifiable awards of assistance to religious organizations and cannot but convey a message of endorsement to slighted members of the community." *Id*. at 15.

11

Both state and federal courts have consistently adhered to the Supreme Court's *Texas Monthly* holding:   Benefits provided to taxpayers exclusively on the basis of religion violate the Establishment Clause.   The Colorado Supreme Court cogently summarized this state of the law in *Catholic Health Initiatives of Colorado v. City of Pueblo*, 207 P.3d 812, 818 (Colo. 2009):

> The Establishment Clause mandates equal treatment of different religious and secular actors.   A tax which makes distinctions based on religious belief would violate the Establishment Clause.   "The risk that governmental approval of some or disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude."   *United States v. Lee*, 455 U.S. 252, 263 n.2, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982) (Stevens, J., concurring).

> The United States Supreme Court addressed the impact of tax exemptions on this perception of impartiality in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S. Ct. 890, 103 L. Ed. 2d 1 (1989) (Brennan, J., Plurality Opinion).   In *Texas Monthly*, the State of Texas exempted religious periodicals and books from sales tax, while imposing that tax on other nonreligious publications.   *Id*. at 5.   The Court, noting that "every tax exemption constitutes a subsidy that affects nonqualifying taxpayers" held the tax exemption violated the Establishment Clause.   *Id*. at 14.   The Court went on to outline the proper, constitutionally valid approach to religious exemptions.   *Id*. at 14-15.   It held that, when a subsidy "is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally" does not violate the Establishment Clause.   *Id*.   However, "when Government directs the subsidy exclusively to religious organizations" in a way that "either burdens non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion," the tax exemption "provides unjustifiable assistance to religious organizations and cannot but convey a message of endorsement" of religion.   *Id*.

> Thus, in order for a sales tax exemption to comply with the Establishment Clause, it must serve a broad secular purpose.   If the work of a religious organization falls within that secular purpose, it may properly enjoy the tax exemption.   However, a tax exemption may not be awarded to religious organizations simply because they are religious.   *Id*.

Here, the Government provides a tax benefit to churches that is not otherwise available to similarly situated taxpayers like the plaintiff.  The Government's policy of allowing churches and religious organizations to openly and notoriously engage in partisan politics is not applied neutrally and generally to a broad range of taxpayers. Churches constitute a privileged class under the Government's policy.

The Government's policy provides a very significant benefit to churches and religious organizations, which can retain their tax-exempt status while also actively engaging in partisan politics.  By contrast, the Plaintiff must choose between tax-exempt status and partisan politics.  The Plaintiff cannot retain its tax-exempt status without complying with requirements that are not applied to churches.  The Plaintiff, moreover, cannot afford to risk its tax-exempt status, and so the Plaintiff complies with the restrictions of § 501(c)(3).

The law is well settled, however, that pre-enforcement challenges to government policies and practices constitute Article III cases or controversies.  *Brandt v. Village of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010).  Contrary to the Government's suggestion, a person need not risk sanctions before bringing a pre-enforcement challenge.  *See Goldhammer v. Nagoad*, 621 F.3d 581, 586 (7th Cir. 2010).  The existence of a statute or regulation implies a clear threat to enforce, so a pre-enforcement challenge is proper under Article III.  *See Bauer v. Shepard*, 620 F.3d 704, 708 (2010); *see also Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (a pre-enforcement plaintiff "need not show that

the authorities have threatened to prosecute him" because "the threat is latent in the existence of the statute").

The Government's suggestion that FFRF must risk its tax-exempt status by openly and notoriously defying the electioneering restrictions of § 501(c)(3) is as unrealistic as it is legally unnecessary.  Tax-exempt status is important to the Plaintiff, which can hardly afford to jeopardize its tax-exempt status, despite the invitation of the IRS in this case. Non-compliance is not necessary, however, to challenge the Government's preferential treatment of religious organizations.

In the end, the Government's preferential treatment of churches cannot help but be perceived as an endorsement of religion.  This was the conclusion of the Supreme Court in *Texas Monthly*, and such lack of equal treatment and neutrality is an interest under the Establishment Clause which the Supreme Court has consistently recognized as constituting a wholly sufficient injury for purposes of standing.

The discriminatory treatment of the Plaintiff at issue in this case, therefore, clearly satisfies the injury requirement for standing.  Courts have consistently allowed underinclusive statutes to be challenged by individuals who are similarly situated but denied benefits on the basis of criteria proscribed by the Constitution.  (This point is discussed more thoroughly below.)  That was obviously the case in *Texas Monthly*, and more recently, the Supreme Court has reiterated that plaintiffs have standing when they are denied a benefit on even terms because of religious criteria.

The Supreme Court has specifically recognized that standing "can result from alleged discrimination in the Tax Code, such as when the availability of a tax exemption

is conditioned on religious affiliation." *Arizona Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436, 1440 (2011).  Standing is premised in such cases on the personal discrimination that occurs when similarly situated individuals are denied a Government benefit on equal terms because of religious identification.  "If a law or practice, including a tax credit, disadvantages a particular religious group or a particular nonreligious group, the disadvantaged party does not have to rely on *Flast* to obtain redress for a resulting injury."  *Id*. at 1449.  That reasoning applies equally in the present case, where maintaining tax-exempt status requires less from churches than other similarly situated organizations like the Plaintiff.

## IV.   THE PLAINTIFF ALSO ALLEGES COGNIZABLE EQUAL PROTECTION INJURIES FOR PURPOSES OF STANDING.

In the equal protection context, injuries resulting from governmental discrimination also provide a basis for standing to those persons who are denied equal treatment under the law.  *Doe v. Lower Marion School District*, 2011 U.S. App. LEXIS 24747 at 40 (3rd Cir., Dec. 14, 2011).  *See also Walker v. Housing Authority of Dallas*, 169 F.3d 973, 979 (5th Cir. 1999).  *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  *See also Pederson v. Louisiana State University*, 213 F.3d 858, 871 (5th Cir. 2000).

The Supreme Court, in *Heckler v. Mathews*, 465 U.S. 728 (1984), carefully considered just such an issue of standing, in an equal protection context where the extension of benefits to a disfavored group was not an available remedy.  The only remedy at issue in *Heckler* was nullification of a statute that provided benefits

exclusively to a favored group.  The Supreme Court concluded in *Heckler* that "we have never suggested that the injuries caused by a constitutionally underinclusive scheme can be remedied only by extending the program's benefits to the excluded class."  *Id.* at 738. The Court further stated that "we have frequently entertained attacks on discriminatory statutes or practices, even when the Government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class."  *Id*. at 739.   The Court concluded, therefore, that nullification as a remedy of choice does not deprive a plaintiff of standing to seek judicial redress for alleged discrimination.  *Id*.

The Supreme Court explained in *Heckler* that the right to equal treatment guaranteed by the Constitution is not necessarily coextensive with any substantive right to the benefits denied to the party being discriminated against.  *Id*.   The Court emphasized, instead, that the discrimination itself gives rise to standing.  "Accordingly, as Justice Brandeis explained, when the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class, as well as by extension of benefits to the excluded class."  *Id*. at 740.

Even where the remedy of extension is not available, and only nullification is an available option for the Court, "the injury caused by the unequal treatment allegedly suffered may be redressed by a favorable decision ... and he [plaintiff] therefore has standing to prosecute this action."  *Id*.  The Supreme Court expanded upon its reasoning in *Heckler* as follows:

> Consistent with Justice Brandeis' explanation of the appropriate relief for a denial of equal treatment, we have often recognized that the victims of a discriminatory government program may be remedied by an end to preferential treatment for others. *E.g.*, *Gilmore v. City of Montgomery*, 417 U.S. 556, 566-567 (1974); *Norwood v. Harrison*, *supra*, at 470-471; *Griffin v. School Board of Prince Edward County*, 377 U.S. 218, 232-234 (1964). *See also Califano v. Westcott*, *supra*, at 93-94 (Opinion of Powell, J.) (finding federal aid program violative of plaintiffs' right to equal protection, but arguing that appropriate remedy under state statute was to enjoin further payment of benefits to all applicants, including plaintiffs).

*Id*. at n.8.  *See also Iowa-Des Moines National Bank v. Benett*, 284 U.S. 239, 247 (1931) (holding that where the right invoked is for equal treatment, such treatment may be obtained equally well if competitors' taxes are increased or if plaintiff's own taxes are reduced).

The Plaintiff in this case alleges discriminatory treatment specific to its own status as a non-profit organization that remains subject to the restrictions of § 501(c)(3).  The Plaintiff, therefore, is similarly situated to churches and religious organizations that otherwise are preferentially excluded from the restrictions of § 501(c)(3).

The Plaintiff's differential treatment suffices as a concrete and particularized injury for purposes of standing, moreover, regardless of the number of other secular non-profits that are also disadvantaged.  The Government's argument to the contrary is based on a flawed understanding of the particularity requirement.  The Seventh Circuit recognized this misunderstanding in *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005):

> The particularity requirements does not mean, contrary to the Secretary's interpretation, that a plaintiff lacks standing merely because it asserts an injury that is shared by many people.  *FEC v. Akins*, 524 U.S. 11, 23-25,

> 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998).  It is often the fact that an interest
> is abstract and the fact that it is widely shared go hand in hand.  But their
> association is not invariable, and where a harm is concrete, though widely
> shared, the Supreme Court has found 'injury in fact.'

*Id.* at 24.  *See also Students Challenging Regulatory Agency Procedures (SCRAP)*, 412

U.S. 669, 687-88, 37 L. Ed. 2d 254, 93 S. Ct. 2405 (1973) ("Standing is not to be denied

simply because many people suffer the same injury ... To deny standing to persons who

are in fact injured simply because many others are also injured, would mean that the most

injurious and widespread Government actions could be questioned by nobody.").

The recognized injury caused by discriminatory treatment notwithstanding, the

Government remains oblivious.  The Government instead argues that FFRF is "simply"

complaining because churches and religious organizations are given preferential

treatment in comparison to other non-profit organizations like the Plaintiff.  According to

the Government, this is just a "psychic" reaction to discrimination, which courts should

not be bothered to consider.  Equal treatment of similarly situated individuals is simply

not an enforceable objective, under the Government's analysis.

The Government's argument, however, misperceives the nature of the injury

necessary for standing.  The "injury in fact" in an equal protection case of this variety is

the denial of equal treatment resulting from the imposition of barriers to government

benefits not available to similarly situated persons; the injury is not the ultimate inability

to obtain the benefit, but rather the discriminatory treatment itself.  *Lac Du Flambeau*,

422 F.3d at 497, quoting *Northeastern Florida Chapter of Associated General*

*Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  In the present

case, the Plaintiff's injury is similarly akin to that raised by the plaintiffs in *Associated General Contractors* -- the inability to maintain tax-exempt status on equal footing with churches and religious organizations, which are exempted from the requirements of § 501(c)(3) by the Government's policy and practice.

The Plaintiff in this case, therefore, does allege redressable injuries under the Equal Protection Clause of the Constitution, as well as under the Establishment Clause. The Plaintiff is similarly situated to religious organizations and churches, as to which the restrictions on electioneering are not enforced.  This preferential treatment provides a basis for standing because the Plaintiff is personally denied equal treatment by virtue of the Government's policy.  The Government's reliance upon *Allen v. Wright*, 468 U.S. 737, 755 (1984), is misplaced, therefore, because the Plaintiff is, in fact, personally denied equal treatment under the law.

## V.      CONSTITUTIONALLY UNDERINCLUSIVE POLICIES AND PRACTICES ARE REDRESSABLE BY NULLIFICATION.

A court can remedy a constitutionally underinclusive policy by declaring the policy a nullity and ordering that preferential treatment not be extended to the favored members of the class.  *Cherry Hill Vineyards, LLC v. Liloy*, 553 F.3d 423, 435 (6th Cir. 2008), citing *Califano v. Westcott*, 443 U.S. 76, 89 (1979).  The Supreme Court made this result clear in *Heckler*, 465 U.S. at 739, holding that nullification does not deprive a plaintiff of standing to seek judicial redress for allegedly discriminatory benefits.  When the right invoked is that to equal treatment, the appropriate remedy is a

mandate of equal treatment, "a result that can be accomplished by withdrawal of benefits from the favored class." *Id.* at 740.

Courts have subsequently recognized *Heckler* for the proposition that similarly situated taxpayers do have standing to challenge underinclusive policies by seeking nullification -- without being limited only to the potential remedy of an administrative appeal of final agency action.  In *Finlator v. Powers*, 902 F.2d 1158 (4th Cir. 1990), for example, the Fourth Circuit Court of Appeals expressly rejected the argument that an underinclusive statute is only redressable by a claim for refund.

The *Finlator* decision recognized that Supreme Court precedent unequivocally holds that non-exempt taxpayers have standing to challenge the constitutionality of tax code exemptions.  *Id.* at 1160-61, citing *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), and *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987).   In *Arkansas Writers' Project*, the Supreme Court, by Justice Marshall, warned that to deny standing to such parties might otherwise "effectively insulate underinclusive statutes from constitutional challenge."  481 U.S. at 227.  The Supreme Court further noted that its decision in *Arkansas Writers' Project* was consistent "with the numerous decisions of this Court in which we have considered claims that others similarly situated were exempt from the operation of a state law adversely affecting the claimant." *Id.*

The defendant in *Finlator*, nonetheless, unsuccessfully argued that an implicit requirement of *Arkansas Writers' Project* and *Texas Monthly* is that non-exempt parties must take affirmative steps to achieve standing, such as contesting a tax prior to its payment, refusing to pay a tax, paying the tax under protest or a reservation of rights,

20

paying a tax and seeking a refund, or taking some other action to permit the Government to preclude or redress the injuries *ab initio*.  *Finlator*, 902 F.2d at 1161.  The Court of Appeals, however, refused to read such a requirement into the Supreme Court's decisions. The Court of Appeals explained its conclusion as follows:

> Realistically, if this Court were to deny standing in this case, the appellants would simply protest the payment and collection of the State's sales tax, and refile their suit.  We do not believe that this additional requirement would improve the vigorousness or quality of the parties' advocacy, would enhance the posture of this case, would clarify the legal issues presented for review, would strengthen the justiciability of the appellants' claims, or would contribute in any way to our ability to decide a question presented and contested by parties having a demonstrated interest and stake in its resolution.  Moreover, we conclude that the appellants did suffer actual injury in this case as a result of the discriminatory treatment dispensed by the Secretary -- purchasers of "Holy Bibles" need not protest the State's sales tax in order to claim the exemption, while purchasers of other texts, both sacred and non-sacred, must protest the sales tax in order to claim the Exemption.  Simply stated, an injury is created by the very fact that the Secretary imposes additional burdens on the appellants not placed on purchasers of "Holy Bibles."   Finally, we believe that it would be an untenable waste of judicial resources to deny the appellant standing in this case given the patent unconstitutionality of the Exemption.

*Id*. at 1162.

In *Planned Parenthood of South Carolina Incorporated, et al. v. Rose*, 361 F.3d 786, 791 (4th Cir. 2004), the Fourth Circuit reiterated that standing to challenge an underinclusive statute does not require exhaustion of administrative efforts undertaken to obtain the discriminatory benefit.  The decision in *Rose* dealt with a discriminatory personalized license plate program.  The State claimed that the plaintiffs lacked standing because they had not applied for a license plate under the discriminatory scheme.  The

Court concluded that the plaintiffs' failure to apply for an organizational plate was not fatal to their standing:

> Waiting for the plaintiffs to apply for a specialty plate under the organizational statute would neither change the plaintiffs' stake in the controversy nor sharpen the issues for review. We discussed this sort of situation in *Finlator v. Powers*, where the plaintiffs challenged a discriminatory tax law without first protesting the payment of the tax to the top state tax official. In that case we said that requiring the plaintiffs to protest the tax and then refile their suit would not improve the "parties' advocacy ... clarify the legal issues presented for review ... or contribute in any way to our ability to decide a question presented and contested by the parties." *Finlator*, 902 F.2d at 1162. As a result, we concluded that the plaintiffs had standing to bring a facial challenge to the law. For the same reason, the plaintiffs in this case need not first apply for, and be denied, an organizational plate in order to gain standing.

Significantly, in both *Finlator* and *Rose*, the Court ordered nullification of the discriminatory schemes at issue as a final and complete remedy.

The District Court for the District of Nevada recently reached the same conclusion that an underinclusive statute may be redressed by nullification, regardless of whether the plaintiff could thereby receive the benefits of the challenged statute. In *Martinez, et al. v. Clark County, Nevada*, 849 F. Supp. 2d 1131 (D. Nev., 2012), the Court considered Establishment Clause challenges to a statute that required marriages to be performed only by religious clergy. The Court considered the question of redressability and concluded that "even if the Court determined at this [pleading] stage of the proceedings that it would not order extending the statute to include persons such as plaintiffs, "plaintiffs who allege that a statute is underinclusive nonetheless shall be considered to have an injury for which they can obtain redress." *Id*. at 1141.

The Court in *Martinez* expressly rejected the argument that plaintiffs' claims were not redressable because the plaintiffs would not be able to solemnize marriages, even if the Court nullified the offending statutory provision.  The Court held that nullification by itself provided an available avenue of redress in the case of an underinclusive statute, so as to provide standing for the plaintiffs:

> Defendants argue that Plaintiffs' claims are not redressable because even if the Court struck down the offending statutory provision, Plaintiffs still would not be able to solemnize marriages.  Rather, all Plaintiffs would succeed in doing is further narrowing who may solemnize a marriage.  However, Plaintiffs' injuries could be redressed either by extending the right to solemnize marriage to them, or by withdrawing the right to solemnize marriage granted to those with a religious affiliation.  The Court need not address at this stage which remedy is more appropriate in this case should Plaintiffs prevail, as we are only at the standing stage.  But <u>Plaintiffs' injuries are redressable by the Court, even if the Court later decides that extending the right to solemnize marriages to those who are not affiliated with a religious organization is inappropriate.  Eliminating the allegedly unconstitutional distinction redresses Plaintiffs' injuries, regardless of whether Plaintiffs obtain the remedy of being able to solemnize marriages</u>.

*Id*.  (Emphasis added.)

The District Court for the Northern District of Illinois also recently considered the issue of nullification in *Anheuser-Busch, Inc. v. Schnorf*, 738 F. Supp. 2d 793 (N. D. Ill. 2010).  The Court discussed the "extension" versus "nullification" dichotomy as it has been analyzed by the Supreme Court in *Heckler*, and concluded that the deciding court should "measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation."  738 F. Supp. 2d at 811, quoting *Heckler*, 465 U.S. at 739, n.5.

On the merits in *Anheuser-Busch*, the Court concluded that nullification was the most appropriate remedy because that course would least impact the regulatory scheme of which the underinclusive statute was a part.  738 F. Supp. 2d at 815.  Similarly, in the present case, nullification of the constitutionally underinclusive policy applied to churches and religious organizations would be less disruptive to the Government's general interest in enforcing § 501(c)(3) than abrogating the restrictions on political campaign activity for all non-profit organizations.

The Plaintiff's claim in the present case, in short, is redressable by relief that is within the competence and jurisdiction of this court to grant.  Nullification of a constitutionally underinclusive policy that is applied only to churches and religious organizations constitutes an appropriate remedy available to the Plaintiff.  Nor do the Supreme Court's precedents require Plaintiff to risk its non-profit status in order to challenge the Government's constitutionally underinclusive policy of preferential treatment of churches.  This court, accordingly, does have jurisdiction because the Plaintiff's injuries are redressable by relief that is both within the competence and jurisdiction of the court.  The court has the authority and responsibility to eliminate unequal treatment of similarly situated taxpayers based solely on religious criteria.

## VI.   THE ANTI-INJUNCTION ACT DOES NOT AFFECT THE JURISDICTION OF THE COURT.

The Plaintiff's claim in the present case is not barred by the Anti-Injunction Act. The Plaintiff is seeking equitable relief, rather than a restraint on the collection of taxes

by the Government.  The Anti-Injunction Act, however, only precludes actions to restrain the collection of federal taxes.  It states:

> No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

The manifest purpose of the Anti-Injunction Act is to permit the Government to collect taxes without peremptory intervention by the courts.  The Act, therefore, requires that the right to disputed sums be determined initially in an administrative refund proceeding.  *Enochs v. Williams Packing & Navigation Company*, 370 U.S. 7 (1962).  The Act, however, as its plain text states, bars only suits concerning the "assessment or collection of any tax;" it is no obstacle to other claims seeking to enjoin the IRS where the suit at issue does not impede tax collection by the Government.

The present case is like *Hibbs v. Winn*, 542 U.S. 88, 92 (2004), where the Supreme Court allowed a state taxpayer's suit for declaratory and injunctive relief to proceed because the suit did not seek to alter the taxpayer's own tax liability or deplete the state's tax revenue.  The Court emphasized in *Hibbs* that a relevant distinction exists between taxpayer claims that would reduce tax revenues and claims that would enlarge tax receipts.  *Id*. at 108.  The Court also quoted favorably from Judge Easterbrook's opinion in *Dunn v. Carey*, 808 F.2d 555, 558 (1986), where the Seventh Circuit held that the Tax Injunction Act is not applicable to actions that might allow the Government to raise additional taxes, instead of emptying governmental coffers.

The Plaintiff's claims in the present case do not fall within the scope of the Anti-Injunction Act.  The Act's jurisdictional bar only applies where the court's relief would

operate to reduce the flow of tax revenue to the Government.  *See Levy v. Pappas*,

510 F.3d 755, 761 (7th Cir. 2007).  In the final analysis, therefore, what matters is the

relief that the plaintiff seeks.  *Id*.  Only if the relief sought would reduce the flow of tax

revenue to the Government does the Act bar federal jurisdiction.  *Id*. at 762.  "When a

plaintiff alleges that the state tax collection or refund process is giving unfair benefits to

someone else, [however] then according to *Hibbs*, the Act and comity are not in play."

*Id*.  Here, in the present case, the plaintiff does not seek to restrain tax collection by the

Government.

The Seventh Circuit summarized the narrow scope of actions that are prohibited

by anti-injunction acts in *Empress Casino Joliet Corporation v. Blagojevich*, 638

F.3d 519, 532-33 (7th Cir. 2011):

> The Supreme Court has explained that "the principal purpose of the Tax
> Injunction Act is to limit drastically federal-court interference with the
> collection of state taxes."  *Hibbs v. Winn*, 542 U.S. 88, 105, 124 S. Ct.
> 2276, 159 L. Ed. 2d 172 (2004) (quoting *California v. Grace Brethren
> Church*, 457 U.S. 393, 408-09, 102 S. Ct. 2498, 73 L. Ed. 2d 93 (1982)).
> But the Court "reads the statute narrowly to bar only claims that would
> reduce the flow of state tax revenue."  *Levy v. Pappas*, 510 F.3d 755, 760
> n.1 (7th Cir. 2007).  On this understanding, the Act does not prohibit
> "federal court interference with all aspects of state tax administration,"
> *Hibbs*, 542 U.S. at 105, but operates more narrowly to prevent federal
> courts from interfering with a state's collection of tax revenue, *see id*.
> at 106 ("Our prior decisions [regarding the Act] are not fairly portrayed cut
> loose from their source, state-revenue-protective moorings.").  "If the relief
> sought would ... operate to reduce the flow of state tax revenue or would tie
> up rightful tax revenue, then the Act bars federal jurisdiction over the
> claims."  Levy, 510 F.3d at 762 (quoting *Hibbs*, 542 U.S. at 106 and
> *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 527-28, 101 S. Ct. 1221,
> 67 L. Ed. 2d 464 (1981)); *see also Scott Air Force Base Properties, LLC v.
> County of St. Clair*, 548 F.3d 516, 520 (7th Cir. 2008) (Tax Injunction Act
> applies if "the relief sought would diminish or encumber state tax
> revenue").

The controlling precedent, therefore, addresses any concern that this court's jurisdiction is limited by the Anti-Injunction Act. The Anti-Injunction Act limits the court's jurisdiction to restrain tax collection, but it does not make an enforcement action the plaintiff's exclusive avenue of potential relief. Where a plaintiff's suit seeks nullification of a constitutionally underinclusive tax policy, the court does have jurisdiction over the matter.

VII. **THE WAIVER OF SOVEREIGN IMMUNITY IN SECTION 702 OF THE ADMINISTRATIVE PROCEDURE ACT IS NOT LIMITED TO JUDICIAL REVIEW OF FINAL AGENCY ACTION**.

The Government also argues unpersuasively that this case is barred by sovereign immunity because there is no "final agency action." Recent decisions by multiple Courts of Appeals, including the Seventh Circuit, make clear that the waiver of sovereign immunity in § 702 of the Administrative Procedure Act is not limited to "final agency action." The Government overlooks this controlling precedent, while incorrectly trying to characterize the present case as merely a statutory administrative appeal. This is not an administrative appeal under the APA -- and the waiver of sovereign immunity in § 702 is not limited to statutory appeals under the APA.

Because the first sentence of § 702 recognizes a statutory right of judicial review of administrative action, some uncertainty existed until recently as to whether the second sentence of § 702, waiving sovereign immunity, was limited solely to administrative appeals of final agency action. Final agency action is a requirement for initiating an administrative appeal under the APA, but each of the recent decisions have concluded

that the waiver of sovereign immunity in § 702 is not limited to just administrative appeals.

Sovereign immunity shields the Federal Government and its agencies from suit absent waiver, such as by § 702 of the APA. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Whether § 702 constitutes such a waiver, as to a lawsuit against the United States that seeks declaratory and injunctive relief based upon implementation of § 501(c)(3)107 of the Internal Revenue Code, depends on the interaction between the first two sentences of § 702. The pertinent language of the statute reads as follows:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensible party.

The first and second sentences of § 702 play quite different roles, according to the Seventh Circuit Court of Appeals. *State of Michigan v. Grand Traverse Band of Ottawa and Chippewa Indians*, 667 F.3d 765, 774 (7th Cir. 2011), quoting *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 866 (9th Cir. 2011). "The first [sentence] supplies a right to seek review of agency action; the second [sentence], added by the 1976 amendments to the statute, provides a waiver of sovereign immunity." *State of Michigan*, 667 F.3d at 774. The waiver in the second sentence covers actions that seek specific relief other than money damages, which "aptly describes the plaintiffs' claim for declaratory and injunctive relief," in the present case. *Id.*, citing *Blagojevich v. Gates*,

28

519 F.3d 370, 371-72 (7th Cir. 2008) (noting that § 702 "waived sovereign immunity for most forms of prospective relief").

The waiver of sovereign immunity in the second sentence of § 702 of the APA "applies when any Federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under Federal law." *State of Michigan*, 667 at 775. Although the United States has argued in these cases that the requirement of "final agency action" limits the waiver of immunity in § 702, the Government has consistently lost that argument. *Id.* As the Court of Appeals noted in *State of Michigan*, "the Federal Government wisely does not take that position here; as the Ninth Circuit explained recently, the conditions of § 704 affect the right of action contained in the first sentence of § 702, but they do not limit the waiver of immunity in § 702's second sentence." *Id.*, citing *Veterans for Common Sense*, 644 F.3d at 866-68.

Plaintiffs seeking relief against government agencies often invoke § 702 of the Administrative Procedure Act to establish the waiver of sovereign immunity. Here, the Plaintiff has requested prospective injunctive relief requiring the Internal Revenue Service and the Department of the Treasury, and their respective officials, to comply with the requirements of the Establishment Clause in administering § 501(c)(3) of the Internal Revenue Code. The waiver of sovereign immunity in § 702 applies precisely to this type of claim. For its part, the Seventh Circuit has clearly and unequivocally rejected the Government's timeworn argument that this waiver only applies where there has been final agency action.

The Seventh Circuit's interpretation of §702 of the APA is in accord with the recent and consistent holdings of other Courts of Appeals.  For example, in *Treasurer of the State of New Jersey v. United States Department of Treasury*, 684 F.3d 382, 384 (3rd Cir. 2012), the Court of Appeals relied on the "opinions of several Courts of Appeals that have clarified that the waiver of sovereign immunity in § 702 extends to all non-monetary claims against Federal agencies and their officers, regardless of whether or not the cases seek review of 'agency action' or 'final agency action' as set forth in § 704."  In *Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007), the Court of Appeals also held that § 702 encompasses all actions for relief against a Federal agency or its officers.  In *Veterans for Common Sense*, 644 F.3d at 866, the Court likewise noted that the sovereign immunity waiver of § 702 applies to more than just administrative appeals.  "Injunctions may be sought, for example, to enforce the Constitution itself; courts need no statutory authorization to undertake such constitutional review."  *See*, *e.g.*, *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("It is established practice for this Court to sustain the jurisdiction of Federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

In the present case, the Plaintiff raises just such a constitutional challenge, which does not depend on any cause of action created by the first sentence of § 702.  Instead, the Plaintiff has "brought an action in a court of the United States seeking relief other than money damages," which arises under the Constitution itself, and as to which sovereign immunity has been waived by § 702's second sentence.  As the Court aptly recognized in *Delano Farms Company v. U.S. Department of Agriculture*, 655 F.3d 1337,

1344 (Fed. Cir. 2011), § 702 waives sovereign immunity for all actions stating a claim against the United States, or its officers or employees, and seeking relief other than money damages.  "Nothing in the text of § 702 limits its scope to 'agency action,' as defined in § 704 of the APA, or 'final agency action,' for which § 704 of the APA directly provides the right to judicial review."  *Id*.  The present action, accordingly, is not barred by sovereign immunity, which has been undisputedly waived by § 702.

## VIII.  SECTION 702 OF THE APA ALSO WAIVES THE GOVERNMENT'S SOVERIGN IMMUNITY AS TO CLAIMS THAT DO NOT ARISE UNDER SECTION 701(a)(2) OF THE AMINISTRATIVE PROCEDURE ACT.

The Government further mistakenly argues that sovereign immunity is not waived in this case because IRS enforcement decisions allegedly are committed to unreviewable agency discretion.  The Government's argument relies on the same mistake made with respect to the Government's "final agency action" argument, *i.e.*, the Government claims that the requirements for an administrative appeal under the APA must be satisfied in order for § 702 to constitute a waiver of sovereign immunity.  The Government specifically argues, at page 25 of its Brief, that § 701(a)(2) proscribes administrative appeals of "agency action committed to agency discretion by law."  The Government then concludes that since § 702 is included in the APA, the sovereign immunity waiver does not apply if the § 701(a)(2) exception applies -- but § 702 is not limited to APA appeals.  That is the key point to be made, which the Government ignores.

The fallacy in the Government's argument lies in the fact that the § 702 waiver of sovereign immunity is broader than the scope of administrative appeals authorized by § 701(a)(2) -- a fact that the Government knows full well.  The issue of whether the

waiver in the second sentence of § 702 is broader than the scope of administrative appeals statutorily authorized by the APA was briefed just last year by FFRF in a case involving the Internal Revenue Service.  (*Freedom From Religion Foundation v. United States*, Case No. 11-CV-0626, Docket No. 26.)  After full briefing, the court subsequently denied the Government's motion to dismiss in that case, rejecting the Government's sovereign immunity and standing arguments like those made in this case.  (Docket No. 30.)

The § 702 waiver, in short, undisputedly applies to "non-statutory" lawsuits, that are not brought under the statutes specifically providing for review of agency action, *i.e.*, the APA.  *Treasurer of the State of New Jersey*, 684 F.3d at 398.  Thus, in *Trudeau v. Federal Trade Commission*, 456 F.3d 178, 187 (D.C. Cir. 2006), the United States Court of Appeals for the District of Columbia held that § 702's waiver of sovereign immunity "is not limited to APA cases and applies regardless of whether the elements of an APA cause of action are satisfied."  In reaching this conclusion, the Court cited the Senate Report accompanying the 1976 APA Amendments, which indicates that § 702's waiver of sovereign immunity was intended to extend to non-statutory review of federal administrative action, including the plaintiff's claims, even if he had not made them under the APA.

In *Veterans for Common Sense*, 644 F.3d at 865, the Ninth Circuit Court of Appeals similarly concluded that the requirements of the APA for an administrative appeal do not limit the broad waiver of sovereign immunity in § 702.  "Section 704 [of the APA] in no way limits § 702's broad waiver of sovereign immunity with respect to

suits for injunctive relief against the Federal Government -- suits for which the APA itself is not the cause of action."   In *Veterans for Common Sense*, the plaintiffs raised a constitutional challenge, "which does not depend on the cause of action found in the first sentence of § 702," and thus the limitations of § 704 were not applicable because the veterans "have brought an action in a court of the United States seeking relief other than money damages that arises under the Constitution itself."  *Id.* at 867.

The distinction between administrative APA appeals and non-statutory causes of action escapes the Government, but is well-illustrated in *Veterans for Common Sense*.  In that case, the Court recognized § 702 as a waiver of sovereign immunity for the plaintiffs' constitutional claims, but on the other hand, the Court actually dismissed purely administrative appeals under the APA, following Supreme Court's reasoning in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).

Here, the Government misconstrues the Supreme Court's *Norton* decision, arguing as if it applied to non-statutory lawsuits, rather than just administrative appeals under the APA.  *Norton*, in fact, did not involve non-statutory claims against an administrative agency.  Instead, the Supreme Court only considered in *Norton* the authority of a federal court under the Administrative Procedure Act to "compel agency action unlawfully withheld or unreasonably delayed," pursuant to § 706(1) of the APA.  *Id.* at 57.  In reaching its conclusion, the Supreme Court recognized that its decision related only to the scope of a court's authority to review under the APA.  *Id.* at 61.

In the present case, Plaintiff's cause of action does not arise under the APA, but rather under the United States Constitution.  As such, this claim is not subject to the

requirements for a cause of action arising only under the APA.  The important point of distinction, therefore, is this: The second sentence of § 702 of the APA constitutes a broad waiver of sovereign immunity, including as to non-statutory claims -- and here, the Plaintiff's cause of action arises under the Constitution, rather than under the administrative appeal provisions of § 704 of the APA.

The Government's reliance on *Heckler v. Chaney*, 470 U.S. 21 (1985), also misses the distinction between administrative appeals under the APA and non-statutory causes of action.  The Government relies on *Heckler* for the proposition that jurisdiction does not exist in cases in which an administrative agency is exercising its discretion.  But in reaching its decision in *Heckler*, the Supreme Court construed a specific statutory limitation found in § 501(a)(2) of the APA.  The Court did not address whether non-statutory challenges to the constitutionality of administrative action are prohibited in all circumstances in deference to the executive's prerogative.

The *Heckler* decision only considered the extent of judicial review authorized by the Administrative Procedure Act.   *Id*. at 823.   The Court's decision specifically addressed the construction of the APA's comprehensive provisions for judicial review of agency actions contained in §§ 701-706.  *Id*. at 827-28.  Unlike *Heckler*, however, the present case does not involve a cause of action arising under the APA, and that is the point on which the Government has nothing to say.

The *Heckler* decision, moreover, is not a decision that the Supreme Court intended to prohibit non-statutory Constitutional challenges.  As the Court's majority noted, "nor do we have a situation where it could justifiably be found that the agency has

'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id*. at 833, n.4. The Court majority also noted in conclusion that "no colorable claim is made in this case that the agency's refusal to institute proceedings violated any constitutional rights of respondents." *Id*. at 838. Justice Brennan, in concurrence, further emphasized that the Court's *Heckler* decision does not hold that non-enforcement decisions are unreviewable where an agency engages in a pattern of non-enforcement of clear statutory language; or where an agency has refused to enforce a regulation lawfully promulgated and still in effect; or where a non-enforcement decision violates constitutional rights. *Id*. at 839.

The Government nonetheless relies exclusively on cases addressing administrative appeals brought under the APA, including under § 701(a)(2). The Government, for example, cites prominently *Borrelli v. Secretary of Treasury*, 343 F. Supp. 2d 249 (S.D. N.Y. 2004), for the proposition that an administrative appeal is inappropriate as to matters committed to agency discretion. That case, however, did not involve the broad waiver of sovereign immunity in § 702, as the Second Circuit Court of Appeals recognized in its subsequent review. The Court of Appeals concluded that "the Administrative Procedure Act provides no cause of action for plaintiffs to challenge the Federal Defendants' actions and does not waive the Federal Government's sovereign immunity for these purposes." *Borrelli v. Secretary of Treasury*, 155 Fed. Appx. 556, 558 (2nd Cir. 2005). The present case, unlike *Borrelli*, does not involve an administrative appeal brought pursuant to the APA, but rather involves a constitutional

challenge to the Government's actions.  The broad waiver of § 702 of the APA does apply to this type of case.

The Government's reliance on cases construing the requirements for administrative appeals under the APA simply are not applicable to the Plaintiff's constitutional claims made in the present case.  This case is not brought as an administrative appeal under the APA, but the Government's sovereign immunity nonetheless is waived by the second sentence of § 702 found in the APA.  The Government's entire argument in regard to sovereign immunity ignores this distinction, while claiming that § 702 only waives sovereign immunity for causes of action brought for judicial review under the provisions of §§ 701-706 of the APA.  To succeed on its argument, therefore, the Government must persuade this court that the myriad of recent decisions are all wrong in holding that the sovereign immunity waiver of § 702 is broader than claims brought for administrative review under the APA.  Authority for the Government's position does not exist.

## IX.   PRUDENTIAL CONSIDERATIONS WEIGH IN FAVOR OF EXERCISING JURISDICTION.

The Government's appeal for unfettered discretion is more self-serving than founded in law.  Enforcement policies that discriminate on the basis of proscribed criteria have long been subject to judicial review.  Even prosecutorial and law-enforcement discretion cannot be exercised on the basis of suspect criteria such as race, gender or religion.  Restrictions on speech, moreover, such as in § 501(c)(3), simply cannot include exemptions that give preferences on the basis of prohibited factors.

Speech restrictions that are valid when considered in isolation may nonetheless be unconstitutional if they impermissibly favor or disfavor certain content, viewpoints, or speakers.  *See R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-86 (1992). "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."  *Citizens United v. FEC*, 558 U.S. 310, 898-99 (2010). Exemptions from a speech restriction also can render the exemption fatally underinclusive and cast doubt on the Government's justification therefor.  *See Brown v. Merchant's Association*, 180 S. Ct. 2729, 2740 (2011).  The principle that a regulation of speech may be impermissibly underinclusive, therefore, is firmly grounded in basic First Amendment principles.  *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); *Saeg v. City of Dearborn*, 641 F.3d 727, 738 (6th Cir. 2011).

Constitutional accountability, even as to underinclusive regulations, is well established, even when a complaining party may only eliminate a discriminatory preference, without eliminating the speech regulation itself.  Here, the Plaintiff contends that the Government's practice and policy of exempting churches and religious organizations from the restrictions of § 501(c)(3) is unconstitutional.  If Plaintiff prevails on this argument, however, and the court strikes down the exemption for churches, the Plaintiff FFRF still may remain covered by § 501(c)(3).  But, "if plaintiff did not have standing to challenge the exemption, underinclusive statutes would be effectively insulated from constitutional challenge."  *Rippling v. Collins*, 868 F.2d 1043 (9th Cir. 1989).  Plaintiff, therefore, does have standing to claim a constitutional violation because others similarly situated, *i.e.*, churches and religious organizations, are exempt

from the operation of § 501(c)(3).  As the Supreme Court stated in *Arkansas Writers'*
*Project*, 41 U.S. at 218, "we do not accept the Commissioner's notion of standing, for it
would effectively insulate underinclusive statutes from constitutional challenge, a
proposition we soundly rejected in *Orr v. Orr*, 440 U.S. 268, 272 (1979)."

Judicial review of the Government's policy and practice of religious preference is
not unprecedented, nor even impractical.  The Plaintiff is not asking the Court to make
individual enforcement decisions.  The Plaintiff, instead, requests the Court to enjoin the
Government's institutional preference for religion.  This is no different than enjoining the
Government from executing racially discriminatory policies in hiring, firing, prosecuting,
or enforcing the laws and regulations that the Government administers.

The Government's own argument, *i.e.*, that its discretion should not be constrained
by the Constitution, is extraordinary.  The Government, naturally, would prefer to not be
subject to judicial review, but that is not the applicable state of the law.  The Government
is subject to the rule of law, including the Establishment Clause of the Constitution.

The Government reveals an institutional conceit in arguing that its practices and
policies are wholly beyond judicial accountability.  The Government candidly argues for
unfettered discretion, regardless of whether its policies and practices give preferences to
churches and religious organizations that are not extended to other tax-exempt
organizations.  In fact, however, the Government's institutional preference for religion is
subject to the rule of law, including compliance with the Constitution.

Prudential considerations, therefore, support the exercise of jurisdiction in this
case, contrary to the Government's suggestion.  This is not a case where the Plaintiff is

asserting the rights of others; the Plaintiff only objects to discriminatory treatment to which the Plaintiff is subjected.   The Plaintiff is also within the protected zone of interests implicated by the Establishment Clause and Equal Protection requirements of the Constitution.   The Government's suggestion that only churches and religious organizations are affected by the Government's preference ironically would limit standing only to the beneficiaries of the Government's unconstitutional preferences -- and that is precisely why judicial involvement is appropriate and necessary:  Underinclusive practices and policies by the Government otherwise would be effectively beyond redress, as the Supreme Court recognized in *Arkansas Writers' Project*, 481 U.S. at 227.

The discrimination at issue in this case is unlikely to be rectified by legislative means, in any event.  The Government's preferential policy, in fact, should be subjected to strict scrutiny and should be sustained only if it is suitably tailored to serve a compelling state interest.  *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985).  No such interest inheres in the Government's preferential policy at issue in this case.  Here, Congress has already spoken by enacting § 501(c)(3), which on its face restricts partisan electioneering for all tax-exempt organizations, without exception for churches and religious organizations.   In spite of Congress's existing mandate, however, the IRS has adopted a practice and policy of not applying the restrictions of § 501(c)(3) to churches and religious organizations -- so more legislation is not likely to change anything.  On the contrary, the Government claims to have unfettered discretion to act as it chooses, answerable to no one, regardless of the laws of Congress. The Government's argument may be understandable from a self-interested perspective,

but it does not constitute a prudential reason for the court to abdicate its Article III responsibilities to the Plaintiff.

**X.    <u>CONCLUSION</u>**.

For all the above reasons, the Government's motion to dismiss should be denied.

Dated this 14th day of May, 2013.                    BOARDMAN & CLARK LLP

By:      */s/ Richard L. Bolton*
Richard L. Bolton,
Wisconsin State Bar No. 1012552
*rbolton@boardmanclark.com*
Boardman and Clark, LLP
1 S. Pinckney St., Ste 410
Madison, Wisconsin 53703-4256
Telephone: 608-257-9521
Facsimile: 608-283-1709

<u>Notice of Electronic Filing and Service</u>

I hereby certify that on May 14, 2013, this document was filed electronically in accordance with the ECF procedures of the United States District Court, Western District of Wisconsin, under Rule 5(d)(1), Federal Rules of Civil Procedure.  All parties who are represented and have consented to service of electronically filed documents are served upon receipt of the NEF from the electronic filing system.

To the best of my knowledge, there are no parties in this case that require service by means other than electronic service using the Court's NEF.

F:\DOCS\WD\26318\25\A1649097.DOCX  [ffrf brief in opposition to government's motion to dismiss]